IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SHIRLEY LOVE, on behalf of herself and all others similarly situated, ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | No. 05 C 1980 |
| O'CONNOR CHEVROLET, INC., and LEGAL INVESTIGATIONS, INC., ) ) ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Plaintiff Shirley Love brought this action against O'Connor Chevrolet, Inc. claiming violations of the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691; the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681; and the Illinois Consumer Fraud Act ("ICFA"), 815 ILCS 505/2. Love also filed class claims against O'Connor for deceptive advertising in violation of the ICFA and for violation of the Illinois Wage Assignment Act ("IWAA"), 740 ILCS 170/1. Finally, Love brought an individual claim against Legal Investigations, Inc. alleging a violation of the ICFA. Love's complaint arises from her purchase of a 2003 Chevrolet Cavalier from O'Connor and O'Connor's repossession (through Legal Investigations) of the car.

The Court dismissed Love's FCRA claim for failure to state a claim and stayed pending arbitration her ICFA false advertising and IWAA claims. O'Connor has moved for summary judgment on Counts 1 and 3, Love's claims under the ECOA and the ICFA. For the reasons stated below, the Court denies O'Connor's motion.

**Facts**

Sometime before June 11, 2003, Love saw an ad placed by O'Connor in a local newspaper. Pl.'s LR 56.1 Stmt. ¶ 20; Def.'s Resp. to Pl.'s LR 56.1 Stmt. ¶ 20. The ad stated that a buyer could drive away in a car for as little as no money down, regardless of the buyer's credit history. Pl.'s LR 56.1 Stmt. ¶ 21. The ad also stated that financing would not be a problem because O'Connor owned the financing agency. *Id*. Love responded to the ad by calling the number provided and leaving her contact information. Pl.'s LR 56.1 Stmt. ¶ 22; Def.'s Resp. to Pl.'s LR 56.1 Stmt. ¶ 22. Al Mackey, a salesman at O'Connor, returned Love's call and left a message asking her to come to the dealership. Pl.'s LR 56.1 Stmt. ¶ 25; Def.'s Resp. to Pl.'s LR 56.1 Stmt. ¶ 25.

On June 11, 2003, Love went to O'Connor and met with Mackey. Def.'s Summ. Judg. Mem., Ex. A at 19. At the dealership, Love and Mackey discussed the type of car that Love was interested in purchasing. Pl.'s LR 56.1 Stmt. ¶ 30; Def.'s Resp. to Pl.'s LR 56.1 Stmt. ¶ 30. They further discussed the potential terms of a new car purchase. Pl.'s LR 56.1 Stmt. ¶¶ 31-33; Def.'s Resp. to Pl.'s LR 56.1 Stmt. ¶¶ 31-33. Love test drove a 2003 Chevrolet Cavalier. Pl.'s LR 56.1 Stmt. ¶ 34; Def.'s Resp. to Pl.'s LR 56.1 Stmt. ¶ 34. Back at the dealership, Love signed an "Immediate Delivery Rider" and a Bill of Sale entitled "Dealer Arranged Financing," along with other paperwork. Def.'s LR 56.1 Stmt. ¶¶ 7, 10; Pl.'s Resp. To Def.'s LR 56.1 Stmt. ¶¶ 7, 10. Love also filled out a credit application for submission to O'Connor's finance agency. Def Ex. A at 37. According to Love, Mackey assured her that O'Connor owned the finance company. Pl.'s LR 56.1 Stmt. ¶ 38. O'Connor did not require Love to make a down payment on the car. Pl.'s LR 56.1 Stmt. ¶ 41. Love left O'Connor with a 2003 Cavalier. *Id*.

The Immediate Delivery Rider and the Bill of Sale both stated that Love might have to return the vehicle if financing could not be secured. Def.'s LR 56.1 Stmt. ¶¶ 13, 14. The relevant language in the Immediate Delivery Rider is:

> If the Seller [O'Connor] is unable to sell, transfer, assign, or otherwise negotiate this contract to any financing source or organization engaged in the business of financing the subject matter of this contract, within five (5) days of this date and so notifies Buyer(s) [Love] (even if Buyer(s) credit information is found to be true, correct and complete), then in that event, Seller shall have the option to immediately cancel the within contract between Buyer(s) and Seller and Buyer(s) shall forthwith return the said vehicle to Seller at the Seller's Primary place of business during normal business and Seller shall return to Buyer(s) all the Buyer(s) deposits less any amounts kept due to damage of said vehicle. The responsibility of each to the other thereafter on said contract shall be terminated.

Def.'s Summ. Judg. Mem., Ex. C. The relevant part of the Bill of Sale is:

> In the event of a time sale, O'CONNOR SHALL NOT BE OBLIGATED TO SELL UNTIL AND UNLESS a finance source approves this order and agrees to purchase a retail installment contract between Customer and O'Connor based on this order . . . This agreement may be cancelled by O'Connor if O'Connor determines that if cannot obtain third party approval and may be canceled by either party if no financing is obtained for Customer on the agreed terms within 15 business days of the date of this agreement, If the contract is terminated as a result of the inability to obtain third party financing, Customer agrees to return the vehicle with 24 hours of notice from O'Connor and O'Connor agrees to return the Customer's trade and down payment, if applicable. O'Connor may repossess the vehicle if Customer refuses to return it.

Def.'s Summ. Judg. Mem., Ex. D (emphasis in original).

About one or two weeks later, O'Connor notified Love that it could not obtain financing for the car and that Love would have to return it. Pl.'s LR 56.1 Stmt. ¶ 42; Def.'s Resp. to Pl.'s LR 56.1 Stmt. ¶ 42. Love returned the car as asked. Def.'s Summ. Judg. Mem., Ex. A at 34. About one week later, Mackey called Love and informed her that if she could make a down payment on the car, he was sure that O'Connor could obtain financing. Pl.'s LR 56.1 Stmt. ¶ 44. Love returned to O'Connor with $400 as a down payment and met with Barbara Owen, a representative from the finance department. Pl.'s LR 56.1 Stmt. ¶¶ 45, 46; Def.'s Resp. to Pl.'s

LR 56.1 Stmt. ¶¶ 45, 46. Love contends that during her meeting with Owen, she signed a Retail Installment Contract with Evergreen Finance Company that Owen back-dated to June 11, 2003. Pl.'s LR 56.1 Stmt. ¶ 47. After signing the contract, Love says she left O'Connor in possession of the Cavalier for the second time. Pl.'s LR 56.1 Stmt. ¶ 48.

On July 4, 2003, Legal Investigations repossessed the Cavalier at the request of O'Connor. Def.'s LR 56.1 Stmt. ¶ 18; Pl.'s Resp. to Def.'s LR 56.1 Stmt. ¶ 18. Love called O'Connor to inquire about the repossession and talked to Sean Galvin and Mackey. Pl.'s LR 56.1 Stmt. ¶ 51; Def.'s Resp. to Pl.'s LR 56.1 Stmt. ¶ 51. Love asked both men on separate occasions why O'Connor had repossessed the Cavalier. Pl.'s LR 56.1 Stmt. ¶¶ 52, 55; Def.'s Resp. to Pl.'s LR 56.1 Stmt. ¶¶ 52, 55. Both men stated that they were not sure; Galvin stated he would find out why and get back to Love. Pl.'s LR 56.1 Stmt. ¶¶ 53, 56; Def.'s Resp. to Pl.'s LR 56.1 Stmt. ¶¶ 53, 56. Galvin never called Love back. Pl.'s LR 56.1 Stmt. ¶ 54; Def.'s Resp. to Pl.'s LR 56.1 Stmt. ¶ 54. There is some evidence suggesting the repossession took place because financing again could not be obtained. *See* Def.'s Summ. Judg. Reply Ex. A. But because O'Connor has made no attempt to lay a foundation for, or explain this evidence, the Court is unable to determine on the present record exactly what triggered the repossession or what steps, if any, O'Connor took leading up to the repossession.

After the repossession, Love received a notice from Bank One dated July 8, 2003 stating that Bank One would approve financing for her purchase of the car at terms different from those requested. Pl.'s LR 56.1 Stmt. ¶¶ 58, 59; Def.'s Resp. to Pl.'s LR 56.1 Stmt. ¶¶ 58, 59. Love contends she never received notice of denial of credit or a counteroffer from any other lending agency. Pl.'s LR 56.1 Stmt. ¶ 57. O'Connor contends that Nationwide Cassel sent Love a denial

4

of credit notice. Def.'s LR 56.1 Stmt. ¶ 16; Def.'s Summ. Judg. Mem., Ex. E. O'Connor also contends that it informed Love that it could not arrange financing by sending her a handwritten note on a business card dated June 30, 2003. Def.'s Resp. To Pl.'s LR 56.1 Stmt. ¶ 49; Def's Summ. Judg. Reply, Ex. A.

As a result of the repossession, Love says, she missed a week of work because she could not obtain transportation to her midnight shift. Pl.'s LR 56.1 Stmt. ¶ 63; Def.'s Resp. to Pl.'s LR 56.1 Stmt. ¶ 63. Additionally, Love says, she was forced to rent a car until she could purchase a new one. Pl.'s LR 56.1 Stmt. ¶ 65; Def.'s Resp. to Pl.'s LR 56.1 Stmt. ¶ 65. Love also claims that she suffered emotional distress as a result of the repossession, requiring medical treatment. Pl.'s LR 56.1 Stmt. ¶¶ 67, 68; Def.'s Resp. to Pl.'s LR 56.1 Stmt. ¶¶ 67, 68.

## Discussion

O'Connor has moved for summary judgment on Love's ECOA and ICFA claims. Summary judgment may be granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must construe all facts and any reasonable inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

1.   **ECOA claim**

The case as presented to the Court on summary judgment is somewhat of a muddle, at least with regard to the ECOA claim, because O'Connor has not done a particularly good job of addressing or delineating the issues involved. Its opening summary judgment memorandum was

rather cursory, to say the least; it devoted all of four short paragraphs to the ECOA claim. When Love raised, in response, a number of reasons for denying summary judgment that O'Connor had not addressed, O'Connor dealt with them in a similarly cursory way in its reply. The Court will address the issues in the sequence in which they were raised, doing the best we can to sort things out.

In its opening memorandum, O'Connor argued, without much elaboration, that it was not required to send adverse action notices because the declining creditor (Nationwide Cassell) had done so, and that this was shown by the fact that the declining creditor had mailed Love notice. *See* Def.'s Summ. Judg. Mem. at 2-3. In response, Love contended that she never received notice from Nationwide Cassell and argued that O'Connor had failed to provide evidence that Nationwide Cassell had even mailed the notice.

Love has the better of this argument, at least for summary judgment purposes. Though O'Connor provided a copy of the notice purportedly sent to Love by Nationwide Cassell, it did not provide evidence sufficient to give rise to a presumption of delivery. To get the benefit of that presumption, the party claiming that notice was sent must produce either evidence of the actual mailing of the particular notice or evidence of the sending entity's normal business practices giving rise to an inference that the notice was sent. *See Godfrey v. United States,* 997 F.2d 335, 338 (7th Cir. 1993); *Thele v. Sunrise Chevrolet, Inc.,* No. 03 C 2626, 2004 WL 1194751, *9 (N.D. Ill. May 28, 2004). O'Connor has done neither with regard to Nationwide Cassell. In its reply, O'Connor cites the fact that Nationwide Cassell produced the notice in response to a subpoena asking for documentation sent to Love. Nationwide Cassell's mere

6

production of the notice in response to the subpoena, without more, is not enough to raise an evidentiary presumption of delivery.

What we have just discussed is sufficient to deny O'Connor's motion for summary judgment on the ECOA claim, as we have rejected the sole argument O'Connor relied upon in its motion as to that claim. But because certain alternative arguments made by Love in her response to O'Connor's motion have also been discussed by the parties to some extent, we will deal with them as best we can to avoid the need to revisit them as the litigation proceeds.

In her response to O'Connor's motion, Love argued that even were O'Connor to prevail on the issue of the Nationwide Cassell notice, there were two other creditors who had taken adverse action, neither of which sent an adverse action notice. The other two creditors were Bank One and Evergreen Finance – the O'Connor-affiliated entity. We will deal with each in turn.

In her response, Love contended that Bank One sent a counteroffer that O'Connor never acted upon or forwarded to Love. *See* Pl.'s Summ. Judg. Mem. at 9. But Love's Rule 56.1(b)(3) submission referred to, and attached, a notice that she received from Bank One dated July 8, 2003. *See* Pl.'s LR 56.1 Stmt. ¶¶ 58-59 & Ex. 1. That being the case, the Court is somewhat mystified as to why Love raised the Bank One issue; she has effectively to have admitted that she received notice from Bank One of the purported adverse action. Though Bank One's notice did not give any reason for rejecting the credit terms that had been proposed, it did, as required by the statute, provide contact information allowing Love to obtain the reasons. *See* 15 U.S.C. § 1691(d)(2). The Court rejects Love's argument that O'Connor was required to provide separate notice of Bank One's action. As this Court held in *Thele v. Sunrise Chevrolet, Inc.,* No. 03 C

7

2626, 2004 WL 1194751, *7 (N.D. Ill. May 28, 2004), when the lender provides an ECOA-compliant notice, the agency that tried to arrange financing through that lender does not violate the ECOA by failing to provide its own separate notice.

Love also contended in her response to O'Connor's motion that O'Connor violated the ECOA by failing to send her an adverse action notice after the repossession of the automobile. *See* Pl.'s Summ. Judg. Mem. at 7. That is a rather odd way to put it; it is the refusal to grant credit – not repossession – that triggers the obligation under ECOA to send an adverse action notice. *See* 15 U.S.C. § 1691(d)(1). As best as we can tell, however, Love is arguing she never received notice that her revised financing had been turned down after she took the car home for the second time. The only evidence that O'Connor provides suggesting that anyone gave Love such notice is a handwritten note made on an O'Connor advertising flyer that appears to state:

> 6/30/03 (MONDAY MORNING) (10:00 AM)
>
> Hello, Shirley Love;
> Please call me as soon as
> you get back in town. As
> per our phone call last
> Friday (6/27/04), the loan
> did not materialize.
> PLEASE CALL ME
> ASAP - THANK
> YOU - AL
>
> (P.S) WHEN YOU RECEIVE THIS CARD PLEASE CALL ME IMMEDIATELY.
> THANK YOU.

Def.'s Summ. Judg. Reply, Ex. A. There are several potential problems with reliance on this note as an ECOA-compliant notice, but we need deal only with a threshold infirmity: O'Connor has not provided so much as a scrap of evidence authenticating the note or establishing that it was actually sent to Love.

8

O'Connor also attached another exhibit to its reply, dated June 19, 2003, that appears to be an Evergreen Finance worksheet regarding Love's credit application. *See* Def.'s Summ. Judg. Reply, Ex. B. The document suggests that Evergreen wanted a further increase in Love's down payment as well as a cosigner. But again, O'Connor has provided no evidence authenticating this document, let alone describing how it fits into the chain of events at issue in this case.

O'Connor appears to argue that the worksheet reflects that Evergreen did not take adverse action on Love's application but rather just requested more information. *See* Def.'s Summ. Judg. Reply at 2. But that is not how the worksheet appears to read; it states, under the heading "DISPOSITION," that Evergreen "will consider w/ more cash & cosigner." *Id.,* Ex. B. If, as the worksheet suggests, Evergreen was saying it would consider giving Love financing only on terms that differed from those that had been proposed, that constituted adverse action requiring notice under the ECOA. The statute defines adverse action as a "denial or revocation of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or on substantially the terms requested." 15 U.S.C. § 1691(d)(6). The implementing regulations promulgated by the Federal Reserve Board further define adverse action as "a refusal to grant credit in substantially the amount or on substantially the terms requested in an application unless the creditor makes a counteroffer (to grant credit in a different amount or on other terms) and the applicant uses or expressly accepts the credit offered." 12 C.F.R. § 202.2(c)(I).[1] A creditor's request for a larger down payment than previously sought, and a cosigner where none was previously requested, would in fact constitute a refusal to grant

---

[1] The regulation's exception for a counteroffer accepted by the borrower is the reason why O'Connor's first request for a down payment (the $400 put up by Love) did not require a separate notice of adverse action.

9

credit "on substantially the terms requested." *Cf. Diaz v. Paragon Motors of Woodside, Inc.,* 424 F. Supp. 2d 519, 535 (E.D.N.Y. 2006) (stating that if plaintiff had not accepted new terms, increase in interest rate and requiring plaintiff to increase down payment would have constituted adverse action); *Bayard v. Behlman Auto. Serv., Inc.,* 292 F. Supp. 2d 1181, 1187 (E.D. Mo. 2003) (proposed increase in interest rate constituted adverse action). Providing more cash up front can be a difficult or even an insurmountable task for a borrower, particularly one of modest means; requiring a cosigner would impose on Love the obligation to find a creditworthy third party, which likewise might have been difficult. Indeed, O'Connor makes no argument suggesting that such changes to proposed credit terms would fall below the ECOA radar screen.

For these reasons, the Court denies O'Connor's motion for summary judgment as to the ECOA claim.

**2.     ICFA claim**

In her ICFA claim, Love alleges that O'Connor's so-called "spot delivery" practice was deceptive and unfair and that the repossession of her car was unfair. In its motion for summary judgment, O'Connor contends that it did not violate the ICFA because its contracts were clear and Love knew that O'Connor did not guarantee financing and that she would have to return the car if financing was not obtained.

> The ICFA states:
>
> Unfair or deceptive acts or practices, including but not limited to the use or employment f any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in [815 ILCS 510/2] in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

10

815 ILCS 505/2 (1999). To sustain a claim under the ICFA for deceptive practice, Love must show that O'Connor engaged in a deceptive act or practice and intended for Love to rely on the deception, and that the deception occurred in trade or commerce. *Siegel v. Levy Org. Dev. Co.,* 153 Ill. 2d 534, 542, 607 N.E.2d 194 (1992); *Tudor v. Jewel Food Stores, Inc.*, 288 Ill. App. 3d 207, 209, 681 N.E.2d 6, 8 (1997).

For a practice to be unfair under ICFA, the practice must violate public policy, be so oppressive that the consumer has little alternative but to submit, and substantially injure the consumer. *Robinson v. Toyota Motor Credit*, 201 Ill. 2d 403, 417, 775 N.E.2d 951, 961 (2002); *Tudor*, 288 Ill. App. 3d at 210, 681 N.E.2d at 8. Whether a party's actions violate the ICFA is presumptively a question of fact. *People ex rel. Daley v. Datacom Systems Inc.*, 146 Ill. 2d 1, 34-35, 585 N.E.2d 51, 66 (1991).

### a. Spot delivery

Love accuses O'Connor of deceptive "spot delivery." O'Connor argues that it is entitled to summary judgment because its actions were not deceptive or unfair and Love could not possibly have relied on any alleged deception by its staff because the financing conditions were clear in the contracts that Love signed.

The Seventh Circuit has described spot delivery as the practice of entering into a sales contract with a buyer at a low interest rate when the seller knows the buyer will not qualify for that rate, giving the buyer possession of the car, and accepting the buyer's trade-in, and then giving the buyer notification that financing has been denied, forcing the buyer to enter a new contract at less favorable terms because she has, in the interim, become attached to her new car. *See Janikowski v. Lynch Ford, Inc.*, 210 F.3d 765, 768 (7th Cir. 2000).

O'Connor relies on *Janikowski* to argue that the ICFA does not apply to its spot delivery. In *Janikowski*, the plaintiff's claim was that the auto dealer did not tell her that the lower interest rate in her retail installment contract was only an estimate and the plaintiff ultimately became obligated for a rate about twice as high. *Janikowski*, 280 F.3d at 766. The Seventh Circuit rejected the plaintiff's ICFA claim because the contract stated that it could be cancelled by either side if the stated finance terms could not be obtained. *See id*. at 766, 769.

The contracts that Love signed contained language similar to that considered in *Janikowski*, making clear that if O'Connor could not obtain financing on the stated terms, the contract could be cancelled. *See* Def.'s Summ. Judg. Mem., Exs. C and D. The Court agrees with O'Connor that *Janikowski* bars Love's ICFA claim to the extent it is based on changes to the finance terms. Love argues that the Illinois Appellate Court's decision in *Grimaldi v. Webb*, 282 Ill. App. 3d 174, 668 N.E.2d 39 (1996), supports her ICFA theory, but the Seventh Circuit specifically considered *Grimaldi* in *Janikowski. Janikowski,* 210 F.3d at 769. The Seventh Circuit's decisions are binding on this Court.

Love also advances, however, an alternative theory of recovery under ICFA, specifically that O'Connor improperly repossessed the car and that its actions constituted an unfair trade practice. The general rule in Illinois is that repossession is not considered improper if the debtor is in default. 810 ILCS 5/9-609(a); *Zinser v. Uptown Fed. Savings and Loan, F.A.*, 185 Ill. App. 3d 979, 982, 542 N.E.2d 87, 89 (1989). In this case, however, there is no evidence that Love had defaulted on her agreements with O'Connor. In fact, the evidence would support a finding that O'Connor repossessed the car contrary to the provisions of its agreements with Love. The Bill of Sale permitted O'Connor to repossess the car if it terminated the contract due to an inability to

12

obtain financing and Love "refuse[d] to return it." Def.'s Summ. Judg. Mem., Ex. D. O'Connor has failed to offer evidence that it notified Love to return her car to the dealership and that Love refused to do so. Indeed, the first time she was asked to return the Cavalier, Love did so within a day of being asked.

In short, there is evidence that would allow a finding that O'Connor repossessed the car without legal authority to do so. Illinois law makes it clear that repossession without a judicial order may take place only if it "proceeds without breach of the peace." 810 ILCS 5/9-609(b)(2). Repossessing a buyer's car without a default and contrary to contractual requirements could constitute a breach of the peace; we do not have enough information about this particular repossession to determine that issue in this case. Love argues in her response to O'Connor's motion that a repossession contrary to legal requirements is an unfair practice that can be considered a violation of ICFA. Because O'Connor has not replied to this argument, it has conceded the point, at least for present purposes. Love is entitled to maintain her ICFA claim to the extent it arises from the allegedly improper repossession.

## Conclusion

For the reasons stated above, the Court denies defendant's motion for summary judgment [docket no. 50]. The case is set for a status hearing on July 24, 2006 at 9:30 a.m. for the purpose

of discussing the possibility of settlement.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: July 11, 2006

14